COURT OF APPEALS DIV
2013 AUG -5 AM 9: 52

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 67909-1-I |
| | ) | |
| Respondent/Cross Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PAUL DOUGLAS LOISELLE, | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant/Cross Respondent. | ) | FILED: August 5, 2013 |
| | ) | |

VERELLEN, J. — Paul Loiselle challenges his conviction by a jury for two counts of second degree assault. He argues the State did not present sufficient evidence that he was armed with a deadly weapon, specifically, that he used a box cutter in a manner capable of causing death or substantial bodily harm. He also claims the prosecutor committed misconduct by referring to the doctrine of res ipsa loquitur during closing argument. The State cross appeals the trial court's dismissal of the deadly weapon enhancements on both counts. We affirm Loiselle's convictions and remand for imposition of the deadly weapon enhancements.

## FACTS

On December 14, 2010, Rory Tripp, Randy Nickell and Corey Flynn were at the Yen Wor Garden restaurant and bar in Seattle celebrating Tripp's birthday. Paul Loiselle was also at the bar with a separate group of friends celebrating his own birthday. At

approximately 1:30 a.m., bar staff announced that it was closing time. For reasons not clear from the record, Flynn and Loiselle exchanged heated words.

As Tripp, Nickell and Flynn left the bar, Loiselle grabbed a pool cue from a rack near the door and followed them out. One of the bar's employees took the pool cue away from Loiselle and returned it to the bar. Loiselle then lunged at Flynn. Perry Southerland, a regular customer at the bar, saw what he believed to be a grocery store box cutter in Loiselle's left hand. Nickell stepped between Loiselle and Flynn and hit Loiselle. Loiselle swung at Nickell, hitting him in the neck. The force of the blow knocked Nickell backwards onto the ground. Tripp attempted to intervene in the altercation and Loiselle swung at Tripp. Loiselle then went back inside the bar. Nickell's throat had a deep gash that was bleeding heavily. Tripp had a smaller laceration on his neck that was bleeding, and his T-shirt and sweatshirt had also been cut. Both Nickell and Tripp were transported to the hospital. Loiselle was arrested. The arresting officer noticed that Loiselle had dried blood on the thumb and index finger of his left hand.[1]

Dr. Amit Bhrany, a head and neck surgeon, evaluated Nickell's wound to determine the extent of the injury. According to Dr. Bhrany, Nickell's injury was consistent with being caused by a sharp object wielded with "a fair amount of force."[2] The injury resulted in lacerations to the platysma muscle, anterior jugular vein and strap muscles, as well as a superficial cut to the thyroid cartilage and a small tear to the pharynx. Surgeons cauterized Nickell's jugular vein to stop the bleeding and stitched

---

[1] Loiselle is left-handed.

[2] Report of Proceedings (RP) (Aug. 1, 2011) at 43.

both the interior muscles and the skin. Nickell was out of work for approximately six weeks. The box cutter was never recovered.

The State charged Loiselle with two counts of second degree assault with a deadly weapon. At trial, the trial court instructed the jury on the special verdict forms as follows:

> You will also be given special verdict forms for the crimes charged in Counts I and II. If you find the defendant not guilty of these crimes, do not use the special verdict forms. If you find the defendant guilty of either Assault in the Second Degree or Assault in the Third Degree in either Count I or Count II, you will then use the special verdict form for that count and fill in the blank with the answer "yes" or "no" according to the decision you reach. Because this is a criminal case, all twelve of you must agree in order to answer the special verdict form. In order to answer the special verdict form "yes", you must unanimously be satisfied beyond a reasonable doubt that "yes" is the correct answer. If you unanimously have a reasonable doubt as to this question, you must answer "no."[3]

The trial court also instructed the jury on the State's burden of proving all elements of the crimes charged beyond a reasonable doubt.

A jury convicted Loiselle on both charges. The jury also returned deadly weapon special verdicts on both counts.

At sentencing, Loiselle moved to strike the deadly weapon enhancements, arguing that pursuant to State v. Bashaw,[4] the trial court erred in instructing the jury it must be unanimous to answer "no." The sentencing court struck the enhancements.

## DISCUSSION

*Sufficiency of the Evidence*

When reviewing a claim of insufficient evidence, this court must decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational

---

[3] Clerk's Papers at 121.
[4] 169 Wn.2d 133, 234 P.3d 195 (2010).

3

trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[5] In challenging the sufficiency of evidence, the defendant admits the truth of the State's evidence and all inferences that reasonably can be drawn from it.[6] Credibility determinations are reserved for the trier of fact; thus, we defer to the jury on issues of conflicting testimony, witness credibility, and persuasiveness of the evidence.[7]

For the purposes of a special verdict, a deadly weapon is "an implement or instrument which has the capacity to inflict death and from the manner in which it is used, is likely to produce or may easily and readily produce death."[8] "Relevant to this determination are the defendant's intent and present ability, the degree of force used, the part of the body to which the weapon was applied and the injuries inflicted."[9]

Citing In re Personal Restraint of Martinez[10] and State v. Skenandore,[11] Loiselle argues the State failed to prove the box cutter was used in a manner likely to produce death. Both these cases are inapposite. In Martinez, a conviction for first degree burglary, the defendant was armed with a knife sheath but there was no evidence that he used or planned to use a knife in the commission of the crime.[12] In Skenandore, an

---

[5] State v. Ortiz, 119 Wn.2d 294, 311-12, 831 P.2d 1060 (1992) (internal quotation marks omitted) (quoting State v. Bingham, 105 Wn.2d 820, 823, 719 P.2d 109 (1986)).

[6] State v. Spruell, 57 Wn. App. 383, 385, 788 P.2d 21 (1990).

[7] State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992).

[8] RCW 9.94A.825. Weapons that constitute deadly weapons as a matter of law include "any knife having a blade longer than three inches" and "any razor with an unguarded blade." Id. The State concedes that it was unable to prove the box cutter was a deadly weapon as a matter of law.

[9] State v. Zumwalt, 79 Wn. App. 124, 130, 901 P.2d 319 (1995), overruled in part on other grounds by State v. Bisson, 156 Wn.2d 507, 130 P.3d 820 (2006).

[10] 171 Wn.2d 354, 256 P.3d 277 (2011).

[11] 99 Wn. App. 494, 994 P.2d 291 (2000).

[12] Martinez, 171 Wn.2d at 368-69.

4

inmate attempted to stab a corrections officer through a cell window with a homemade spear fashioned from rolled paper bound with dental floss and attached to a golf pencil.[13] The spear did not tear the officer's clothing or skin but left pencil marks on his chest and sleeve.[14] Though the State argued that the pencil could have caused substantial bodily harm had the defendant struck the officer in the face or eye, there was no evidence to support this claim, nor was there evidence that the defendant could have hit the officer's face or eye through the window.[15]

Here, it was reasonable for the jury to infer that the manner in which the box cutter was used had the capacity to cause death. Loiselle cut both Nickell and Tripp on the neck, causing laceration and bleeding. Dr. Bhrany testified that the laceration of even a small blood vessel in the neck could cause death. The evidence in the light most favorable to the State proved that the box cutter constituted a deadly weapon.

### Unanimity Requirement

The State argues the sentencing court erred when it struck the sentencing enhancements based on Bashaw. We agree. The Washington Supreme Court recently overruled Bashaw and expressly upheld an instruction identical to the one given here.[16]

### Prosecutorial Misconduct

Loiselle contends the prosecutor committed misconduct by referring to res ipsa loquitur during closing argument and rebuttal:

---

[13] Skenandore, 99 Wn. App. at 496.

[14] Id. at 497.

[15] Id. at 500.

[16] State v. Nuñez, 174 Wn.2d 707, 710, 285 P.3d 21 (2012).

[T]here is a concept that's usually expressed in Latin, a legal doctrine or a concept, and I'm not going to use the Latin, but the concept is that the thing speaks for itself. . . . It's res ipsa loquitur. It's an old legal doctrine that the thin[g] speaks for itself. In malpractice cases, if somebody is opened up after a surgery and they find a sponge inside that person, obviously, the doctor has committed malpractice, somebody screwed up. The thing speaks for itself. Res ipsa loquitur. That's this case.

The injuries in this case speak for themselves. They're speaking to you. The evidence in this case is overwhelming. The defendant escalated the situation far beyond necessity and he used an instrument to cut intentionally the throat of Randy and he intentionally used an instrument, a blade, to cut Rory. He's the only one that can do it. Res ipsa loquitur. It speaks for itself and it's speaking to you in a straight line[.] [A]nd this and all the other evidence leads to the defendant who put himself in that chair by continuing to escalate, and today that straight line leads to his conviction. He is guilty of the crimes of assault in the second degree in Count I and Count II. Thank you.

. . . .

. . . There's absolutely no indication whatsoever there was anything sharp on that tree or that somehow . . . these injuries came from this tree[.] [A]nd the key thing, ladies and gentlemen, . . . is that there's absolutely . . . no other explanation for how Rory received his injury[.] [I]f you take a look at . . . State's Exhibit No. 4, that shows you right there that with his left hand, it's almost like a perfect like a slash like that, almost straight in line, the shirt up that way, cut, cut, cut, all the way through. Res ipsa. Take a look at 28. Do you see anything sharp on that tree? The evidence in this case is overwhelming, ladies and gentlemen. The defendant cut, cut, and substantially wounded and assaulted both men with a deadly weapon, the manner in which it was used. [17]

Loiselle did not object to the deputy prosecutor's statements.

"[T]he doctrine of res ipsa loquitur provides an inference of negligence from the occurrence itself which establishes a prima facie case sufficient to present a question for the jury."[18] Loiselle argues that the reference to res ipsa loquitur effectively relieved the State of its burden of proof.

---

[17] RP (Aug. 3, 2011) at 44-45, 63-64.

[18] Metro. Mortg. & Sec. Co., Inc. v. Washington Water Power, 37 Wn. App. 241, 243, 679 P.2d 943 (1984).

To prevail on a claim of prosecutorial misconduct, a defendant must show both improper conduct and prejudicial effect.[19] Prejudice occurs only if "there is a substantial likelihood the instances of misconduct affected the jury's verdict."[20] A failure to object waives any claim of error unless the comments were so flagrant and ill-intentioned that no instruction could have cured the resulting prejudice.[21] Defense counsel's failure to object strongly suggests the argument in question does not appear prejudicial in the context of the trial.[22] We review misconduct claims in the context of the total argument, the evidence addressed, the issues in the case, and the jury instructions.[23]

Although the common sense concept that a person's action speaks for itself is not improper, the introduction of legal terminology from civil tort law is not well considered. However, viewed in context, it is clear the deputy prosecutor was arguing only that Nickell and Flynn's neck wounds were evidence that they had been stabbed with something sharp, and the only evidence of a sharp object was Loiselle's box cutter. The deputy prosecutor relied solely on the literal meaning of res ipsa loquitur and did not suggest that the concept affected the State's burden of proof. The trial court properly instructed the jury that the State had the burden of proving all elements of the offense beyond a reasonable doubt. In light of these facts, Loiselle fails to establish that the deputy prosecutor's statements constituted misconduct.

---

[19] State v. Roberts, 142 Wn.2d 471, 533, 14 P.3d 717 (2000).

[20] State v. Pirtle, 127 Wn.2d 628, 672, 904 P.2d 245 (1995).

[21] State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997).

[22] State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).

[23] State v. Boehning, 127 Wn. App. 511, 519, 111 P.3d 899 (2005).

*Statement of Additional Grounds*

In his statement of additional grounds, Loiselle argues that the trial court erred by: (1) admitting into evidence a small key-shaped knife that was not used in the crime; (2) allowing a law enforcement officer to testify regarding the knife; (3) instructing the jury on the careful handling of the knife; and (4) denying a defense motion to dismiss.

A few days after the stabbing, the owner of the Yen Wor Garden contacted the Seattle Police Department, reporting that a weapon had been found on the property. Officer Paul Gingrey responded and retrieved a small, key-shaped knife with a folding blade. At trial, Officer Gingrey testified that the knife appeared to have dried blood on it, and that he received an e-mail "saying there might be blood on there, from the evidence section."[24] The trial court admitted the exhibit. The jury was instructed to try to use gloves if handling the exhibit in the jury room due to the presence of blood.

At the conclusion of Officer Gingrey's testimony, defense counsel moved to dismiss, claiming that he had never received a copy of the e-mail in discovery. The State had also never seen the e-mail. To address the issue of blood on the knife, the State recalled Detective Paul Takemoto, who testified that he had not ordered it to be tested. Detective Takemoto stated he did not believe it was the weapon used in the case because the blade was too short and would have produced "more of a puncture wound."[25] Following Detective Takemoto's testimony, defense counsel agreed, stating, "I think that what we did with the detective seemed pretty curative."[26] The trial court denied the motion to dismiss, stating:

---

[24] RP (Aug. 2, 2011) at 53.

[25] Id. at 85.

[26] Id. at 87.

[T]he motion is denied. We don't really have the document that Officer Gingrey thinks he received[.] [B]ut most significantly[,] that information was never passed on to anybody who was in a position to follow it up or disclose it to defense counsel. So the prosecutor assigned the case, the detective assigned the case, never had information that someone suspected there was blood on [the key-shaped knife]. Someone put . . . biohazard tape on the exhibit, but that information apparently just wasn't passed up the chain so that anyone could do anything with it, so I've denied the motion.[27]

The admissibility of evidence rests within the sound discretion of the trial court, and this court will not disturb the trial court's decision unless no reasonable person would adopt the trial court's view.[28] While the purpose of admitting a weapon that all parties agreed was not used in the crime is somewhat unclear, we cannot say it was an abuse of the trial court's discretion. Moreover, even if the admission of evidence was error, it "requires reversal only if the error, within reasonable probability, materially affected the outcome of the trial."[29] Detective Takemoto emphasized that the key-shaped knife was not the weapon used to stab Nickell and Tripp. Neither the State nor defense mentioned it in closing argument. We cannot say there was a reasonable probability that the verdict was affected by this evidence.

Nor are we persuaded that the trial court's statement to the jury was prejudicial to Loiselle. The trial court emphasized several times the importance of wearing gloves when handling any physical exhibit that might have blood on it. These instructions were offered for the safety of the parties and the jury and were not unduly prejudicial.

Loiselle argues that the failure of the trial court to exclude the key-shaped knife or instruct the jury to disregard Officer Gingrey's testimony "left the [d]efense with no

---

[27] Id. at 88.

[28] State v. Atsbeha, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001).

[29] State v. Halstien, 122 Wn.2d 109, 127, 857 P.2d 270 (1993).

relief" other than his motion to dismiss.[30]  But Loiselle's motion to dismiss was on the basis of an alleged Brady[31] violation.  The trial court found no Brady violation because there was not a reasonable probability that disclosure of the evidence would have changed the outcome.  Moreover, Loiselle conceded below that Detective Takemoto's testimony was sufficiently curative.  The trial court did not err in denying Loiselle's motion to dismiss.

Loiselle's conviction is affirmed.  We remand for resentencing with imposition of the deadly weapon enhancement.

WE CONCUR:

---

[30] Statement of Additional Grounds at 3.

[31] Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).