IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 72960-8-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ABDIRAHMAN S. SAKAWE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 29, 2016 |
| | ) | |

BECKER, J. — Convicted of assault in a bench trial, appellant Abdirahman Sakawe challenges the trial court's finding that he used a deadly weapon. He also claims that when he raised a defense of diminished capacity, the court did not hold the State to its burden of proving he acted with the specific intent necessary to prove assault. Finding no error, we affirm.

According to the trial court's unchallenged findings of fact, Abdikadir Elmi was watching television late one night when he heard a noise in the kitchen. As he opened the kitchen door, Elmi saw a stranger who was later identified as Sakawe. Sakawe grabbed Elmi by the neck and forced him onto a sofa. Elmi's brother rushed into the room and pulled Sakawe off Elmi.

Sakawe went into the kitchen and picked up a serrated knife with a blade six inches in length. He "flailed with it" towards Elmi.[1] In wresting the knife away from Sakawe, Elmi grabbed the blade. This left visible marks on his hand, although no laceration. No one was seriously injured in the brief scuffle. Sakawe ran outside and jumped off the balcony. Police soon tracked him to a nearby yard with the aid of a police dog.

The State charged Sakawe with burglary in the first degree and two counts of assault in the second degree for assaulting another person "with a deadly weapon." See RCW 9A.36.021(1)(c). The case was tried to the court in October 2014.

The court found Sakawe not guilty of the burglary charge and guilty of the lesser included offense of first degree criminal trespass. The court found him guilty of the count of deadly weapon second degree assault related to Elmi and not guilty of the other count related to Elmi's brother. Sakawe appeals.

The first issue is the sufficiency of the evidence to prove that the serrated knife was a deadly weapon. "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. State v. Thomas, 150 Wn.2d 821, 874, 83 P.3d 970 (2004).

---

[1] Finding of Fact 5.

According to the statutory definition, an explosive or a firearm is a deadly weapon per se. A deadly weapon can also be any other instrument readily capable of causing death or substantial bodily harm "under the circumstances in which it is used":

> "Deadly weapon" means any explosive or loaded or unloaded firearm, and shall include any other weapon, device, instrument, article, or substance, including a "vehicle" as defined in this section, which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.

RCW 9A.04.110(6). The circumstances of a weapon's use include the intent and present ability of the use, the degree of force, the part of the body to which it was applied, and the physical injuries inflicted. State v. Skenandore, 99 Wn. App. 494, 499, 994 P.2d 291 (2000).

In Skenandore, the defendant, locked in a prison cell, managed to strike an officer through a portal in the cell door through which the officer was delivering a meal. The defendant's instrument was a homemade spear about three feet long, made out of rolled up writing paper bound with dental floss and affixed to a golf pencil. Skenandore, 99 Wn. App. at 496. The spear did not tear the officer's shirt or break his skin. The defendant's conviction on a charge of deadly weapon second degree assault was reversed for insufficient evidence that the pencil-tipped spear was a deadly weapon:

> The record did not reflect that Jones' face was near the cuff port such that the spear could have struck his eye; rather, the evidence was that Jones was looking through a higher vertical window off to the side as he served Skenandore breakfast through the cuff port. Moreover, the three blows all landed on Jones' upper torso, well below his head. The cell door that separated Jones and Skenandore, together with the small opening of the low cuff port,

3

about one-third of the way from the floor, restricted the spear's movement.

Skenandore, 99 Wn. App. at 500. The surrounding circumstances "inhibited the spear's otherwise potential, but unproven, ready capability to inflict substantial bodily harm." Skenandore, 99 Wn. App. at 500.

Sakawe argues that like in Skenendore, there was insufficient evidence to prove that the knife he used to attack Elmi had the potential to inflict substantial bodily harm under the circumstances in which it was used. But unlike in Skenendore, Sakawe's range of motion was not limited in a way that prevented him from striking Elmi in the head, face, or eye. During the scuffle in which Sakawe tried to get away, he brandished the knife at Elmi. Elmi was able to disarm Sakawe by grabbing the blade. Sakawe's argument emphasizes that the knife did not have a point and it left no lacerations on Elmi's skin. But, the testimony that the family used the knife to cut meat is sufficient evidence to support a finding that it was readily capable of inflicting substantial bodily harm in these circumstances. It was lucky for Elmi that he did not get seriously hurt. The court did not err in determining that Elmi committed assault with a deadly weapon.

The second issue is whether the trial court failed to hold the State to its burden of proving the required mental state for assault.

An officer who was dispatched to the scene where Sakawe was found testified that he "seemed real groggy" and "kind of drunk maybe." While being transported to jail, Sakawe asked some rational questions and some questions that were bizarre.

Sakawe announced before trial that his defense would be involuntary intoxication. Sakawe did not testify. He called a psychologist, Dr. Robert Deutsch, as an expert witness. Deutsch offered his opinion that Sakawe was in a delusional state during the incident because he had recently ingested intoxicants, the impacts of which were exacerbated by lack of sleep, food, and shelter for several days.

Sakawe argued that evidence of his delusional state proved a complete defense that excused him from criminal responsibility because he did not know the nature and quality of his acts or that his acts were wrong—in other words, that his intoxication was so extreme it equated with temporary insanity. See State v. Mriglot, 88 Wn.2d 573, 576, 564 P.2d 784 (1977). Sakawe did not, however, offer any evidence of force or fraud as would be necessary to prove his intoxication was in fact involuntary. See State v. Stacy, 181 Wn. App. 553, 571, 326 P.3d 136, review denied, 335 P.3d 940 (2014). ("Involuntary intoxication is intoxication caused by force or fraud." As the State pointed out in closing argument, there was "no substantive evidence in this case that the defendant unknowingly ingested anything."

Sakawe responded in his closing argument by offering voluntary intoxication as an alternative theory that would give the court the option of finding diminished capacity rather than total loss of capacity to distinguish right from wrong: "In the alternative, if the court finds that this was a voluntary intoxication, then the standard becomes that Mr. Sakawe did not have the specific—have the capability to form the specific intent of the charges—of the crimes that the State

has charged." Voluntary intoxication does not excuse the criminality of an act, but it can render the defendant incapable of forming the specific intent necessary for conviction of a crime. Stacy, 181 Wn. App. at 569.

Unlike insanity or involuntary intoxication, a claim of diminished capacity is not an affirmative defense. It merely seeks to negate one of the elements of the alleged crime. State v. Stumpf, 64 Wn. App. 522, 525, 827 P.2d 294 (1992). When a defense negates an element of a crime, it violates due process to place the burden of proof on the defendant. State v. W.R., 181 Wn.2d 757, 765, 336 P.3d 1134 (2014). Here, the burden remained on the State to prove all elements of the crime beyond a reasonable doubt, and that burden included disproving Sakawe's claim of diminished capacity. See W.R., 181 Wn.2d at 763-64, 766-67.

Sakawe contends that the trial court erroneously placed upon him the burden of proving that he lacked the specific intent element of assault. He claims this is evident from the court's refusal to find him capable of "forming the rudimentary intent necessary" for an assault. In finding of fact 12, the court agreed with Dr. Deutsch that, on the night in question, Sakawe was under the influence of a controlled substance.

> However, the court could no more find that Mr. Sakawe was incapable of forming the rudimentary intent necessary for a trespass or assault than it could find—on the testimony of Dr. Deutsch alone—that a preponderance of evidence supported a conclusion that the intoxication was involuntary.

Sakawe interprets the above sentence as a statement by the court that Sakawe did not meet his burden of proving he was incapable of forming the necessary intent. We do not read the sentence as assigning a burden of proof to Sakawe.

The court simply stated that it could not find that Sakawe was incapable of forming the necessary intent.

The specific intent needed to prove second degree assault is the intent "either to create apprehension of bodily harm or to cause bodily harm." State v. Byrd, 125 Wn.2d 707, 713, 887 P.2d 396 (1995). Sakawe contends the use of the word "rudimentary" shows that the court thought the only specific intent required was the intent to do the act of assault, i.e, picking up the knife. Again, we disagree. Neither the word "rudimentary" nor anything else in the record suggests that the court was unaware of the law. The word "rudimentary" accurately reflects the ease with which the specific intent to cause harm or fear of harm can be inferred from evidence of a knife attack.

In short, finding of fact 12 does not support Sakawe's argument that the trial court failed to hold the State to its burden of proof. Finding of fact 14 states that the State "has proven beyond a reasonable doubt that, in brandishing the bread knife at Abdikadir Elmi, the defendant intentionally assaulted him with a deadly weapon." This express determination by the trial court shows the correct placement of the burden of proof on the State to prove all elements of the crime.

Affirmed.

WE CONCUR:

_Becker, J._

_Cox, J._

7